*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JEREMIAH JAMES BOSHELL,

        Defendant-Appellant.

FOR PUBLICATION
May 13, 2021
9:25 a.m.

No. 347207
Macomb Circuit Court
LC No. 2017-002787-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JEREMIAH JAMES BOSHELL,

        Defendant-Appellant.

No. 347208
Macomb Circuit Court
LC No. 2017-000658-FC

---

Before: FORT HOOD, P.J., and CAVANAGH and TUKEL, JJ.

PER CURIAM.

Defendant stood trial in two different cases that were consolidated for a jury trial. In Docket No. 347207, defendant appeals as of right his convictions of assault with intent to commit murder (AWIM), MCL 750.83, felon in possession of a firearm, MCL 750.224f, carrying a weapon with unlawful intent, MCL 750.226, third-degree fleeing or eluding a police officer, MCL 257.602a(3), and two counts of possession of a firearm during the commission of a felony (second offense) (felony-firearm), MCL 750.227b.[1] The trial court sentenced defendant to life imprisonment for the AWIM conviction, five years' imprisonment for each felony-firearm

---

[1] Defendant pleaded guilty of felon in possession of a firearm and the accompanying felony-firearm charge, and a jury convicted defendant of the remaining offenses.

conviction, and 30 to 60 months' imprisonment for the remaining convictions. In Docket No. 347208, defendant appeals as of right his jury convictions of first-degree premeditated murder, MCL 750.316(1)(a), assault of a pregnant individual causing a miscarriage or stillbirth, MCL 750.90a, and two counts of felony-firearm (second offense). The trial court sentenced defendant to life imprisonment without parole for the first-degree murder conviction, five years' imprisonment for each felony-firearm conviction, and 375 to 600 months' imprisonment for the assault-of-a-pregnant-individual conviction. This Court consolidated defendant's appeals.[2] For the reasons provided below, we affirm.

## I. BASIC FACTS

Defendant's convictions in Docket No. 347207 arise from the shooting death of Lisa Fabbri in Macomb County. At the time of her death, Fabbri was 12 weeks' pregnant. Her body was found inside her car, which in turn was found in the backyard of defendant's friend, Wallace Grala. Defendant and Fabbri were an on-and-off couple for many years, and they had a 16-year-old son at the time of Fabbri's death.

Grala lived on Frost Road in Lenox Township, which is in Macomb County. On the evening of August 14, 2016, defendant came over, unannounced, to visit Grala. Defendant was driving a gray F-150 pickup truck and drove it around Grala's attached garage and parked the vehicle behind the garage. At some point that evening, defendant used cocaine and donned a tactical vest. When Grala went to bed, defendant was still at the home. The next morning, on August 15, 2016, defendant was still present when Grala left for work.

That same afternoon, Grala's neighbor, Beverly Burgess, noticed a gray pickup truck parked behind Grala's house. At approximately 5:00 p.m., she noticed activity coming from Grala's driveway. Specifically, she heard an "elevated" woman's voice, which was angry or upset. Then Beverly saw a PT Cruiser in Grala's driveway with a woman next to it. At approximately 5:15 p.m., Beverly heard a gunshot, which sounded like it came from a smaller firearm—not a rifle. Beverly's husband, Bill Burgess, arrived home shortly thereafter around 5:30 p.m. After Bill arrived home, Beverly heard a truck "take off" on the gravel road. She explained that the truck had come from next door and was accelerating quickly on Frost Road. Beverly did not get a good look at the truck but saw that it was an "obscure gray" color. Bill identified the vehicle as a gray Ford pickup truck, which he recognized was not Grala's.

The next morning, August 16, 2016, Grala went out to his barn and saw a car parked in his field. Upon closer inspection, Grala saw that the car was Fabbri's PT Cruiser and then saw that Fabbri was "hunched over" with blood all over herself. Grala called 911. Fabbri's death was classified as a homicide. She had been shot in the left side of the forehead, with an exit wound out the back, right portion of her head. The presence of stippling indicated that the gun was anywhere from three to six inches away from Fabbri's head at the time of the shooting. In the ensuing police investigation, tracks were noticed leading from Grala's driveway and terminating where the PT

---

[2] *People v Boshell*, unpublished order of the Court of Appeals, entered February 1, 2019 (Docket Nos. 347207 & 347208).

Cruiser was parked. The police recovered a spent shell casing from Grala's driveway and a bullet from the PT Cruiser's passenger-side door.

Later in the afternoon on August 16, 2016, defendant drove to a couple of different transmission shops in the Lapeer area, looking for two people named "Rob" and "Dylan." Defendant was wearing his tactical vest with lots of ammunition and had an AR-15 rifle, a shotgun, and a nine-millimeter handgun in the truck. Defendant was acting very upset and repeatedly stated that he was going to kill Rob and Dylan because he believed they had "set up" his girlfriend "to get whacked." The police were notified and were on the lookout for defendant.

Defendant's convictions in Docket No. 347208 arise from a series of offenses committed after the police eventually spotted defendant driving in Lapeer County, which led to a police chase. There were numerous vehicles involved in the chase, including unmarked vehicles from the Macomb County Sheriff's Department, marked and unmarked vehicles from the Lapeer County Sheriff's Department, and marked Michigan State Police vehicles. Evidence was presented that during the pursuit, defendant fired a gunshot out of his driver's side window. Neighbors heard the gunshot, and a bullet was later found inside one of the homes. There also was a large amount of broken glass in the street.

The pursuit continued onto North Saginaw Street. Defendant was driving erratically and aggressively, including in the oncoming traffic lane, at a high rate of speed. Defendant passed a pedestrian, Virgil Nordlund, narrowly missing him. According to Nordlund, defendant fired a shot out his passenger-side window, which caused glass to shatter and fall onto the road. Nordlund, a Vietnam veteran, testified that he heard and felt the bullet fly right by his head. Seconds later, as Detectives James Onyski and Grant Perry approached in an unmarked police vehicle, defendant fired another shot out his driver's side window, causing more glass to shatter. The pursuit continued for many more miles, ultimately ending on I-69, where defendant was apprehended after his vehicle ended up in a side ditch.

The police recovered an AR-15 rifle, a shotgun, a nine-millimeter pistol, and lot of ammunition from defendant's vehicle. The shell casing that was found in Grala's driveway was positively identified as having been fired from the nine-millimeter handgun found in defendant's possession. The spent bullet found in the PT Cruiser passenger door was of the same class to have been fired from the nine-millimeter gun, but could not be positively identified as having been fired from any particular firearm.

Defendant was charged in Docket No. 347208 for the offenses related to Fabbri's shooting death in Macomb County, and charged in Docket No. 347207 for the offenses associated with the police pursuit in Lapeer County. Both cases were prosecuted in Macomb County. Defendant moved to dismiss the crimes alleged to have been committed in Lapeer County, arguing that venue was not proper in Macomb County. The trial court denied the motion. The two cases were consolidated for trial and defendant was convicted of the offenses as noted above. This appeal followed.

## II. EVIDENTIARY ISSUES

Defendant first argues that the trial court erroneously admitted an autopsy photograph and a series of text messages between him and Fabbri. He contends that the autopsy photograph admitted at trial, depicting Fabbri's dead fetus, as well as text messages unfairly prejudicial toward defendant should have been excluded under MRE 403. We disagree.

We review a trial court's decision regarding the admissibility of evidence for an abuse of discretion. *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008).

When a defendant pleads not guilty to a crime, "the prosecution may offer *all* relevant evidence, subject to MRE 403, on *every* element." *People v Mills*, 450 Mich 61, 70; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995) (emphasis added). Indeed, a defendant's offer to stipulate to certain elements does not alter this principle for those elements. *Id.* at 70 and n 5. In this case, defendant was charged with assaulting a pregnant woman causing stillbirth or miscarriage. One of the elements is that the defendant assaulted a pregnant individual, and another element is that the defendant's conduct "resulted in a miscarriage or stillbirth . . . or death to the embryo or fetus." MCL 750.90a(b). Therefore, the prosecution was entitled to offer all relevant evidence establishing that Fabbri was pregnant and that defendant's actions resulted in the death of Fabbri's fetus. Clearly, any photographs showing the dead fetus would be highly relevant to both of these elements and thus admissible, subject only to MRE 403.

MRE 403 states, in pertinent part, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Ortiz*, 249 Mich App 297, 306; 642 NW2d 417 (2001) (quotation marks and citation omitted). Contrary to defendant's suggestion, photographs are not inadmissible simply because a witness can testify about the information contained in the photographs. *Mills*, 450 Mich at 76. Moreover, photographs are admissible to corroborate a witness's testimony, and a photograph's "[g]ruesomeness alone need not cause exclusion." *Id.* The proper analysis is whether the photograph's probative value is substantially outweighed by unfair prejudice. *Id.*

Initially, we note that, when defendant raised this evidentiary issue before trial commenced, the prosecution offered to submit a black-and-white version of the initially proposed true-color exhibit because its appearance was less gruesome. The prosecution also offered to crop out some "wetness" along the bottom of the photograph, so the focus would solely be on the sac and fetus. The trial court agreed that admitting the cropped, black-and-white version was permissible under MRE 403. The copy of the photo that defense counsel provided to this Court looks more like an illustration from a textbook or dictionary, or a copy of an ultrasound photo. While a fetus is identifiable, the black-and-white photo lacks any "gruesomeness" factor. The mere fact that it displays a fetus is not unfairly prejudicial to defendant because, as previously discussed, that is what makes the photo relevant and probative. Because of the lack of color and resulting lack of details, such as blood or other "wetness," we cannot see how the photo's introduction injected any risk of unfair prejudice. Moreover, assuming any unfair prejudice was introduced, it did not

-4-

substantially outweigh the probative value of the evidence. Accordingly, the trial court did not abuse its discretion by admitting this exhibit.[3]

Next, with respect to the text messages, at the prosecution's request, the trial court admitted numerous text exchanges between defendant and Fabbri. On appeal, as he did at the trial court, defendant asserts that the admission of many of these messages was unfairly prejudicial because the messages were not relevant for any purpose except to show defendant in a bad light and to demonstrate that he was a "jerk" who was more likely to have committed the charged crimes. The challenged messages include numerous comments that were demeaning of Fabbri, such as calling her a "whore" and a "floozy." Defendant also often used crude and vulgar sexual language in requesting oral sex from Fabbri. The trial court ruled that the messages, although involving crude sexual references, were relevant to show the relationship between defendant and Fabbri, and the probative value of the evidence was not substantially outweighed by unfair prejudice. The court noted that because the allegations against defendant included an allegation of premeditated murder, the messages were relevant to show the relationship and discord between defendant and Fabbri.

There is no question that the text messages contained many crude sexual terms and they exhibited a lack of respect toward Fabbri. Regardless, while these references had the potential to inject prejudice into the trial, we cannot conclude that the trial court reached an unprincipled decision in determining that any unfair prejudice did not *substantially* outweigh the probative value of the evidence. As the trial court noted, in a first-degree, premeditated murder case, it is highly relevant to show the past relationship between the defendant and the victim. See *Unger*, 278 Mich App at 229; *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998). Thus, while there arguably was some potential for unfair prejudice that could have been injected into the proceedings through these text messages, it did not substantially outweigh the messages' probative value.

Moreover, even to the extent that the text messages were violative of MRE 403, reversal would not be required. For a preserved, nonconstitutional error, the defendant has the burden to demonstrate that the error resulted in a miscarriage of justice. *People v Hawthorne*, 474 Mich 174, 181; 713 NW2d 724 (2006), citing *People v Lukity*, 460 Mich 484; 596 NW2d 607 (1999). "[S]uch an error does not warrant reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *Hawthorne*, 474 Mich at 181 (quotation marks and citations omitted). And "[a]n error is deemed to have been outcome determinative if it undermined the reliability of the verdict." *Id*. (quotation marks and citations omitted).

The evidence against defendant, although circumstantial, was very strong. Fabbri was last seen in Grala's driveway having a heated exchange with someone. Grala was not home at the time, but evidence suggested that defendant was still there from the night before: a neighbor had seen a gray pickup truck parked behind Grala's house, which is where defendant parked his vehicle the previous night. Further, shortly after this heated exchange, a gunshot was heard by neighbors.

---

[3] Defendant has cited cases from other jurisdictions in support of his argument, but we find those cases distinguishable and unpersuasive. See *People v Spaulding*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 348500); slip op at 5 n 2 (stating that cases from other states, while they can be deemed persuasive, are not binding on this Court).

The shell casing that was found in Grala's driveway was fired from the handgun that was found in defendant's possession. Fabbri's PT Cruiser was relocated from the driveway to the rear of Grala's house. And sometime after the shooting, a gray Ford pickup truck, which was consistent with the truck defendant was driving at the time and was inconsistent with Grala's Chevy truck, was seen and heard speeding away from Grala's home. Further, defendant's statements the following day indicating that Fabbri had been killed tended to show that defendant was the killer because the police explained that they had informed no one—including defendant's father—that Fabbri had been killed. In other words, the only way defendant would have known that Fabbri had been killed was to have been present at the time of the killing. Consequently, even if the text messages were erroneously admitted, it does not affirmatively appear that the error affected the outcome of the proceedings. Therefore, reversal would not be required.

## III. FAIR TRIAL

Defendant next argues that he was denied his due-process right to a fair trial through the inadvertent display to the jurors of a photograph depicting defendant in jail shortly after his arrest. Defendant also argues that the trial court erred by denying his motion for a mistrial related to this issue. We disagree.

This Court reviews constitutional due-process claims de novo. *People v Bosca*, 310 Mich App 1, 26-27; 871 NW2d 307 (2015), app held in abeyance 911 NW2d 465 (2018). We review a trial court's decision on a motion for a mistrial for an abuse of discretion. *People v Dennis*, 464 Mich 567, 572; 628 NW2d 502 (2001). In *People v Rose*, 289 Mich App 499, 517; 808 NW2d 301 (2010), this Court stated:

> Every defendant has a due process right to a fair trial, which includes the right to be presumed innocent. Under the presumption of innocence, guilt must be determined solely on the basis of the evidence introduced at trial rather than on official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial. [Quotation marks and citation omitted.]

At issue is the inadvertent display to the jury of a photograph of defendant. At trial, the prosecutor was attempting to show a cropped version of the photo in question. The purpose was to show the shirt defendant was wearing after his arrest. The photo of defendant in actuality was taken at the Macomb County Jail, and the cropping was to remove any background that possibly might indicate that defendant was in jail at the time. The trial court described the events, outside the presence of the jury, as follows:

> It appears that what we're talking about is a photograph that was taken while the Defendant was in the County Jail. It was agreed off the record that we would crop the photo because all that the Prosecutor was interested in is getting a picture of his shirt. The investigator was being directed to crop the picture so that we would not show the Defendant in the jail setting. The main screen was turned off so that the jurors didn't see it on the main screen, but we are in electronically enhanced courtrooms, meaning that there are one, two, three, four screens in the jury box that the jurors can see. I had a funny feeling and so I asked if anybody is seeing anything on the screen and their answer was yes and I confirmed that by looking down at the

screen I have in front of me and seeing it as well. Which means that the jury has seen, briefly, but they've seen maybe for about at least five or six seconds a photograph of the Defendant, not in cuffs, not restrained, but in a setting that could be the basement of this building, could be any other block-type structure. But it is the jail and do [sic] a perceptive eye it could very well look like the jail.

Now of course the jury has already seen the Defendant in any type of restraints or any indication that he must be guilty because, lookit [sic], they have him in handcuffs. But we don't see that in this photograph.

On the other hand I think a fair, objective way to look at the photograph is that out of 15 jurors probably eight to ten already guessed that that was a photo of him in a jail. That's my initial documentation for the record as to what we saw and obviously what the problem now is.

Defendant thereafter moved for a mistrial, albeit without providing any substantive argument. In response, the prosecutor argued that the picture did not depict defendant behind bars, handcuffed, or in jail attire; instead the picture merely showed defendant standing with his hands behind his back. Further, for the background, it was a plain, "yellowish," "tile wall," with no indication that this was a jail setting. The prosecutor even opined that the background resembled the cafeteria in the basement of the courthouse. The prosecutor also noted that the jury had already seen a videorecording wherein defendant was handcuffed after he was arrested after the pursuit ended on I-69. The prosecutor contended that as a result, there was no prejudice to defendant.

The trial court denied the motion for a mistrial, recognizing that the main question concerned whether the photograph was prejudicial. The court stated that defendant was pictured

in what can be best described as an at ease stance if one were in an Army type of pose. He has his hands behind his back. But he doesn't appear, I mean he clearly doesn't appear like he's shackled, like he's restrained, nor does it look like a mug shot. It is simply a photograph of him up against a wall.

I do think that most people will presume that this was in some official building where he was being held. But it is already clear from his arrest that was seen on the tape, and it had to be seen on the tape because it's the conclusion of the high speed chase. It's one of those unavoidable, real facts about the case that there was a chase, that this was the person that was taken from the car. The jury already knows that he was under arrest. The jury already knows that at one point he was in handcuffs as he was being led from the car. It would have been better had this picture never been shown, but the amount of restraint does not, certainly it's far less concerning than seeing him in handcuffs being led away from the conclusion of a high speed chase. And that I do think is absolutely controlling over here.

The trial court later noted that between it, the prosecutor, and defense counsel, they were intimately familiar with how a jail looks and, therefore, they would be more prone to say, "that's got to be a jail," while common jurors might not "think anything of this at all."

After reviewing the inadvertently shown photo, it is clear that defendant was not deprived of a fair trial. As the trial court correctly observed, there is no explicit indication in the inadvertently shown photo that defendant was in jail. There are no visible handcuffs or any other types of restraints. There also is no prison garb or attire. Additionally, the fact that defendant's hands are behind his back in the inadvertently shown photo is not pertinent because this is seen in the noncontested[4] and admitted photo as well. Further, the background appears to be a nondescript "tile wall." While jurors could speculate that this photo was indeed taken from a jail, according to the trial court's description, *there is nothing that expressly indicates that this was taken from jail*. In sum, the photo did not suggest that defendant was in a jail and did not somehow taint his presumption of innocence. Accordingly, the brief display of the photograph did not deprive defendant of a fair trial.

We further note that the photo showed defendant right after he was arrested following the police chase. In the video that the jury saw, defendant was arrested, handcuffed, and taken to a police vehicle at the scene. Thus, the jury was aware that defendant was being taken *somewhere* to be in custody; whether that place was a "jail" or "police station" or anywhere else is immaterial. With the jurors already having the knowledge that defendant had been restrained and arrested, their seeing defendant later—without any visible restraints and against a generic background— could not have unfairly influenced the jury.

## IV. VENUE

Defendant next argues that his convictions in Docket No. 347207 should be vacated because venue in Macomb County for those charges was improper. Although we agree that venue was improper for those charges, we decline to disturb those convictions because the error was harmless.

"A trial court's determination regarding the existence of venue in a criminal prosecution is reviewed de novo." *People v Houthoofd*, 487 Mich 568, 579; 790 NW2d 315 (2010). We review for an abuse of discretion a trial court's ruling addressing a motion to dismiss. *People v Lewis*, 302 Mich App 338, 341; 839 NW2d 37 (2013). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *People v Buie*, 491 Mich 294, 320; 817 NW2d 33 (2012).

"The general venue rule is that defendants should be tried in the county where the crime was committed." *Houthoofd*, 487 Mich at 579. But the Legislature is permitted to create exceptions to this general rule. See *id*. In this instance, there is no dispute that defendant's alleged actions constituting the crimes in Docket No. 347207 were all committed in Lapeer County. Thus, for venue to be proper in Macomb County, a statutory exception must apply. See *People v McBurrows*, 322 Mich App 404, 414; 913 NW2d 342 (2017), aff'd 504 Mich 308 (2019). In opposing defendant's motion to dismiss these charges on account of lack of venue, the prosecution relied on MCL 762.8 and MCL 762.9.

---

[4] Defendant on appeal has characterized the admitted version as the "sanitized version."

MCL 762.8 provides that "[w]henever a felony consists or is the culmination of 2 or more acts done in the perpetration of that felony, the felony may be prosecuted in any county where any of those acts were committed or in any county that the defendant intended the felony or acts done in perpetration of the felony to have an effect." There are two aspects to this statute, both of which apply only when a felony consists or is the culmination of two or more acts: (1) "venue for prosecution of the felony is proper in any county in which any one of the acts was committed," and (2) venue is proper in any county that the defendant intended the felony or acts done in perpetration of the felony to have an effect. *McBurrows*, 322 Mich App at 415.[5]

In the trial court, the prosecution argued that defendant intended his actions in Lapeer County to have an effect in Macomb County because defendant went to Lapeer County to harm people who he claimed were responsible for Fabbri's death. The trial court openly questioned this rationale and asked, "[W]hat is the [e]ffect that it has in Macomb County, because the timing is that the homicide has already been completed in Macomb County. Going to Lapeer the day after has an effect upon, in the words of John Dunn, the death of one person diminishes me, it has an [e]ffect all around the world. It has an [e]ffect in all other counties in Michigan. What is the peculiar [e]ffect that it has in Macomb County?" In response, the prosecutor averred that if defendant is fleeing the homicide, which happened in Macomb County, then "that's the effect it has." In other words, according to the prosecutor, a defendant fleeing into Lapeer County has an effect on Macomb County for the sole reason that the original crime was committed in Macomb County. We disagree with that position. It is not clear how Macomb County, or anyone inside the county, was affected by any of defendant's action in Lapeer County a day after Fabbri was killed. Merely fleeing the police in one county does not have an effect on anyone in a neighboring county, even if the person ostensibly was fleeing for the purpose of avoiding arrest for a murder that occurred in that neighboring county.

The prosecutor then contended that venue was proper in Macomb County because all of defendant's acts were part of the same plan, where the first part was to kill Fabbri, the second part was to kill Rob and Dylan, and the third part was to kill himself. While this may have indeed been defendant's plan, the trial court erred when it failed to recognize or analyze the actual statutory requirements for allowing venue in a county where the crimes did not take place. During the motion hearing, the court stated that it was inclined to agree with the prosecutor because it thought that in order for defendant to prevail, he must show that "the prosecutor has no facts, no evidence no argument, whatsoever to *link* the two counties." (Emphasis added.) And in making its ultimate ruling, the trial court affirmatively stated that venue would be proper in Macomb County if all of the events were "part of a coherent plan right from the start" or, in other words, "linked." However, as defendant correctly states on appeal, being part of the same "plan" or having events "linked" is not the test for determining whether venue is proper in a county where the crime did not take place.

---

[5] The Supreme Court in *Houthoofd*, 487 Mich at 583-584, held that the version of MCL 762.8 at the time did not contemplate venue for prosecution in places where the effects of the act were felt. After that decision, the Legislature amended MCL 762.8 to include the phrase "or in any county that the defendant intended the felony or acts done in perpetration of the felony to have an effect." 2013 PA 128; see also *McBurrows*, 322 Mich App at 415.

The relevant inquiry under MCL 762.8 is whether defendant *intended* any of his acts in Lapeer County to have any effect in Macomb County.[6] As already discussed, we answer that question in the negative.

Although the prosecution cited MCL 762.9 in its response to defendant's motion to dismiss for lack of venue, it did not make any arguments related to this provision at the motion hearing. MCL 762.9 provides that "[w]henever a felony has been committed on a railroad train, automobile, aircraft, vessel or other moving vehicle, said offense may be prosecuted in any county, city or jurisdiction in which such conveyance was during the journey in the course of which said offense was committed." This provision does not apply to the circumstances in this case.

As this Court has explained, MCL 762.9 "is intended to apply to felonies committed in a moving vehicle in situations where it is difficult to determine the county in which the criminal acts occurred." *People v Slifco*, 162 Mich App 758, 762; 4134 NW2d 102 (1987). It is undisputed that the entirety of defendant's acts related to the crimes charged in Docket No. 347207 occurred in Lapeer County. Indeed, there was no evidence that defendant was in Macomb County on August 16, 2016, at any point before he was taken there after his arrest. At best, the prosecutor maintained that defendant necessarily *started* his trip from Macomb County because he left the county after killing Fabbri on August 15. However, just because defendant was in Macomb County in the evening of August 15 and was in Lapeer County on August 16 does not show that he traveled through Macomb County "during the journey in the course of which said offense[s] [were] committed." Indeed, the evidence shows that the events constituting the Lapeer County criminal charges occurred approximately 24 hours after defendant was last known to be in Macomb County and after defendant did other things, such as stopping at the credit union (in Lapeer County) on the morning of August 16 and meeting with his father later that day (in Lapeer County). Therefore, MCL 762.9 is not applicable to place venue with Macomb County.

Consequently, the trial court abused its discretion when it denied defendant's motion to dismiss the Lapeer County charges on account of venue.

However, any error with respect to statutory venue is not jurisdictional and does not constitute constitutional error. *Houthoofd*, 487 Mich at 588; *McBurrows*, 322 Mich App at 410-411. Rather, defendant has the burden of establishing a miscarriage of justice under a "more probable than not" standard to justify reversing a conviction. *Houthoofd*, 487 Mich at 590. Thus, defendant must show prejudice, i.e., that the error affected the outcome of the lower court proceedings. *Id*. Defendant has failed to make this showing. Defendant merely suggests that the jury was impermissibly swayed to find against him on the Lapeer County crimes because it had

---

[6] The other aspect of MCL 762.8 is not applicable. The prosecution never put forth any argument that the first aspect of MCL 762.8 applied, i.e., that defendant committed any acts in Macomb County in perpetration of the crimes that he allegedly committed in Lapeer County. This part of the statute "merely requires that a defendant commit at least one act of a multiple act felony in the prosecuting jurisdiction." *People v Meredith (On Remand)*, 209 Mich App 403, 409; 531 NW2d 749 (1995). But "it is not necessary that the act constitute an essential element of an offense." *Id*. In this instance, there is no evidence that defendant committed any acts in Macomb County in furtherance of the charged crimes that occurred in Lapeer County.

been influenced by what it heard related to the Macomb County crimes, including the premediated murder of Fabbri. The evidence against defendant was overwhelming with respect to his Lapeer County convictions. Defendant was convicted of AWIM as to Nordlund, felony-firearm, carrying a weapon with unlawful intent, and fleeing or eluding police officers, and two counts of felony-firearm. In short, because the evidence of defendant's guilt of these crimes was overwhelming, he has not shown that the result would have been different had he been tried in Lapeer County.

Notably, regarding the AWIM charge, there were several witnesses who all saw (as evidenced by the shattering and flying of glass from the truck defendant was driving) and heard a gunshot as defendant drove on North Saginaw Street near Nordlund. Nordlund testified that he heard the bullet go right by his head. The fact that defendant fired near Nordlund coupled with the fact that Nordlund immediately before had given defendant "the finger," is strong circumstantial evidence that defendant intended to shoot Nordlund in anger or retaliation. See *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008) (stating that a defendant's intent can be established with minimal circumstantial evidence). And it is beyond any serious dispute that defendant also eluded police in Lapeer County. While that fact may have been uncertain at the beginning of the pursuit when unmarked police vehicles tried to stop defendant, any confusion was removed later when marked police vehicles with lights and sirens took the lead in the pursuit and defendant still failed to pull over.

We also note that defendant's position that the jury was impermissibly influenced by being exposed to the circumstances of Fabbri's murder is belied by the fact that the jury acquitted defendant of AWIM with respect to both Detectives Onyski and Perry. The jury's decision to acquit defendant of those charges shows that the jury took its responsibility very seriously and individually considered each of the charged counts, as it was supposed to do. Accordingly, it is not more probable than not that the venue error affected the outcome of the proceedings. Therefore, we decline to disturb defendant's convictions for the Lapeer County offenses in Docket No. 347207.

## V. JUDICIAL IMPARTIALITY

Defendant lastly argues that he is entitled to a new trial because the trial court's questioning of his expert witness pierced the veil of impartiality. We disagree.

Whether judicial conduct denied a defendant a fair trial is a question of constitutional law this this Court reviews de novo. *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). We review the trial court's decision to deny defendant's motion for a mistrial related to this issue for an abuse of discretion. *People v Ortiz-Kehoe*, 237 Mich App 508, 513; 603 NW2d 802 (1999).

At issue is the trial court's questioning of defense firearms and toolmark expert, David Balash. Balash's testimony for the most part mimicked that of the prosecution's firearms and toolmark expert. Both Balash and the prosecution's expert opined that the casing found in Grala's driveway had been fired from the nine-millimeter handgun found in defendant's possession.[7] Both

---

[7] Indeed, Balash's testimony arguably went even further because he said he was "100-percent" certain of the identification.

experts also testified that testing on the bullet retrieved from the passenger door of Fabbri's PT Cruiser was "inconclusive" and was not able to be positively traced to defendant's nine-millimeter firearm. As Balash noted, because the testing was inconclusive, the bullet "might have been fired [from that gun], it might not have been fired [from that gun]." Further, both Balash and the prosecution's expert agreed that the presumed "bullet" retrieved from inside the home on West Oregon Street in Lapeer was "totally consistent" with being a bullet core, albeit without any jacket covering, which made it impossible to trace to any particular firearm. Without explaining the significance at the time, Balash made a solitary reference to the bullet hole at the house not being "perfectly round."

The last pertinent item that was examined by the experts was the pair of metal fragments that were found inside a utility pole near where Nordlund claimed to have been fired upon. The prosecution's expert opined that the small fragments[8] were merely "suspected lead fragments," which could be parts of a fragmented bullet, but he could not say for certain that they were from a fired bullet. Balash agreed that the metal fragments weighted 3.4 grains and agreed that, independently, they could have been part of a bullet core. However, Balash thought that because they were retrieved from a fairly clean, round hole in the pole, they could not have been parts of a bullet core. Balash explained that bullet *cores* "never, ever make a round hole of entry" because if it is only a bullet core flying through the air, that means it has been damaged already and its jacket has been removed, making the bullet core ballistically unstable, which in turn makes it incapable of making a round hole of entry. Balash stated that he would expect to see an irregularly shaped hole, such as a "keyhole"-shaped hole, as a result of a bullet core. He also questioned that, if by happenstance the bullet core did manage to strike the pole squarely in the midst of its tumbling through the air, thereby making a "perfectly round hole," where did the rest of the bullet core go? He would have expected to see maybe 40 to 50 grains' worth of bullet core, but in this instance, there was only 3.4 grains. In other words, it was Balash's opinion that the 3.4 grains of metal fragments could not have caused the hole in the pole and therefore were not fragments of a bullet core.

During the course of Balash's testimony, the trial court asked numerous questions of the witness. Many of the questions were focused on the presence, or lack of presence, of a metal jacket with the fragments that were found in the utility pole. The judge's questioning occurred multiple times, with the first session occurring during defense counsel's examination of Balash. The second occasion occurred after the prosecutor concluded his questioning. After the parties followed up with a few questions of their own, the trial judge revisited the topic once again, asking several more questions.

A trial judge has broad, but not unlimited, discretion when controlling the court's proceedings. *People v Taylor*, 252 Mich App 519, 522; 652 NW2d 526 (2002); *People v Paquette*, 214 Mich App 336, 340; 543 NW2d 342 (1995). The overriding principle is that a court's actions cannot pierce the veil of judicial impartiality. *Stevens*, 498 Mich at 170; *People v Davis*, 216 Mich App 47, 50; 549 NW2d 1 (1996). Invading the prosecutor's role is a clear violation of this tenet.

---

[8] The expert stated that the fragments weighed a total of 3.4 "grains," while an intact .223-caliber bullet normally would weigh around 62 grains.

*People v Ross*, 181 Mich App 89, 91; 449 NW2d 107 (1989). The trial court, pursuant to MRE 614(b), may question witnesses in order to clarify testimony or elicit additional relevant information. *People v Conyers*, 194 Mich App 395, 404; 487 NW2d 787 (1992). "However, the trial court must exercise caution and restraint to ensure that its questions are not intimidating, argumentative, prejudicial, unfair, or partial." *Id.* at 405. The test to determine whether a trial judge's conduct pierces the veil of impartiality, thereby violating the constitutional guarantee of a fair trial, is whether, when considering the totality of the circumstances, "it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Stevens*, 498 Mich at 171.

> This inquiry requires a fact-specific analysis. A single inappropriate act does not necessarily give the appearance of advocacy or partiality, but a single instance of misconduct may be so egregious that it pierces the veil of impartiality. Ultimately, the reviewing court should not evaluate errors standing alone, but rather consider the cumulative effect of the errors. [*Id*. at 171-172 (citations omitted).]

Because a reviewing court is to look at the totality of the circumstances,

> the reviewing court should inquire into a variety of factors, including [(1)] the nature of the judicial conduct, [(2)] the tone and demeanor of the trial judge, [(3)] the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, [(4)] the extent to which the judge's conduct was directed at one side more than the other, and [(5)] the presence of any curative instructions. [*Id*. at 172.]

## A. THE NATURE OF THE CONDUCT

For the first factor, the nature of the judicial conduct was the trial judge's questioning of Balash. As the Supreme Court has acknowledged, such questioning generally is appropriate under MRE 614(b). *Id*. at 173. Which side this factor favors is a close question. On the one hand, it seems fairly obvious that the trial court devoted way too much energy and time in trying to get Balash to explain his views related to the presence or absence of a metal jacket near the utility pole on Saginaw Street. Balash's views were pretty well explained without the judge's inquiries. Balash opined that, although the fragments retrieved from the pole, by themselves, could have been consistent with bullet fragments, given the circumstances, these fragments could not have been a bullet for one main reason. Because the hole was nearly perfectly round, he would have expected an intact bullet to have made it (assuming a bullet made the hole in the first place). Thus, with only a meager 3.4 grains of fragments found in the hole, it was evident to Balash that these fragments were not bullet fragments that caused that hole. On the other hand, it appears that the judge held a sincere belief that Balash's testimony was at least partially confusing.

In our view, the trial judge did not fully comprehend Balash's views and because of this miscomprehension, it created an "inconsistency" in the judge's mind that needed to be clarified. The judge repeatedly stated that he was confused regarding why it was not important that a metal jacket was not found in the West Oregon house but it supposedly was important that no jacket was found at the Saginaw Street utility pole. If this were the substance of Balash's testimony, then it seems it certainly would have been a valid area for the court to attempt to clarify with further

questions. However, it does not appear that Balash stated what the trial court thought he had said. To the extent that Balash suggested that a metal jacket should have been found in the utility pole on Saginaw Street, it was in the context that he would have expected to have seen an "intact" bullet (necessarily including the metal jacket), which according to him would have been required to have created the nearly perfectly round hole.[9]

Therefore, although in the trial judge's mind, he was attempting to seek clarification of a patent "inconsistency" in Balash's testimony, in reality, there was no patent inconsistency. Consequently, while trial judges are allowed to question witnesses, it does not appear that there was any need to clarify Balash's testimony, and therefore, the questioning here went beyond what generally is contemplated. Importantly, a judge's altruistic intent is irrelevant. See *id*. at 174 ("It is inappropriate for a judge to exhibit disbelief of a witness, intentionally or unintentionally.").

## B. TONE AND DEMEANOR

Next, a reviewing court is to consider the tone and demeanor that the trial judge displayed in front of the jury. Of note, "[a] judge should avoid questions that are intimidating, argumentative, or skeptical." *Id*. at 175. As our Supreme Court has recognized, appellate courts do not have the benefit of viewing a trial judge's tone and demeanor first hand. *Id*. at 176. But sometimes, the nature of the words used can exhibit hostility, bias, or incredulity. *Id*. In this instance, we perceive no ill or hostile tone from the trial judge. Although his questioning was pervasive and arguably repetitious, it does not appear to have had a hostile tone.[10] Further, at the end of Balash's testimony, the trial judge thanked Balash for his testimony and commented that he "thoroughly enjoyed" and appreciated it. Notably, in response, Balash stated that he enjoyed testifying as well. In any event, we conclude that this factor weights in favor of no impermissible partiality.

## C. SCOPE OF JUDICIAL INTERVENTION

---

[9] For reasons that are unclear, when presented with the judge's questions, specifically asking why the absence of a metal jacket at one location mattered and did not matter at another location, Balash never reminded the judge that he previously stated that the hole at the West Oregon house was *irregularly* shaped, which meant that a *damaged* bullet would be expected in the house. This was distinguishable from the perfectly round hole in the utility pole, which if caused by a bullet, one would expect to find a nearly *intact* bullet (arguably including a metal jacket). The mere difference in hole shape between the two locations likely would have resolved any inconsistency in the judge's mind.

We also note that because Balash's testimony regarding the shape of the hole at the West Oregon house was very fleeting (and was a single answer of "No, not at all" to a somewhat leading question asked by defense counsel), it is possible that the trial judge simply missed this fact.

[10] On appeal, defendant does not present any persuasive argument that the trial judge exhibited a hostile tone or demeanor. Instead, defendant relies on the repetitiveness and insistent questioning, which we have addressed. The mere fact that questioning is repetitive or insistent does not mean that the person asking had a hostile tone.

For the third factor, "a reviewing court should consider the scope of judicial intervention within the context of the length and complexity of the trial, or any given issue therein." *Id*. "[G]iven the principle that a judge's questions may serve to clarify points that are obscure or confusing, a judge's inquiries may be more appropriate when a witness testified about a topic that is convoluted, technical, scientific, or otherwise difficult for a jury to understand." *Id*. (citation omitted). Although this was a very lengthy trial, as already noted, the complexity of the issue presented through Balash's testimony did not warrant the extent of the judicial intervention. While the trial judge perceived that there was an inconsistency with the significances Balash attributed to the lack of a metal jacket at both the West Oregon house and the scene at North Saginaw, in actuality, there was no inconsistency. Also, what makes the trial court's questioning even more perplexing is that the court later (correctly) acknowledged that whether the metal fragments retrieved from the utility pole were bullet fragments was wholly inconsequential. As the court recognized, the evidence was overwhelming that defendant had shot his firearm when near Nordlund. Many witnesses heard the gunshot and saw the glass fly from defendant's passenger-side window, and Nordlund stated that he heard and felt the bullet fly right by his head. Thus, it did not matter if those particular fragments from the pole came from defendant's AR-15—the fact that defendant had shot his firearm in the vicinity of Nordlund went uncontested.[11]

## D. THE DIRECTION OF THE JUDICIAL INTERVENTION

For the fourth factor, we must assess whether the judicial intervention was directed toward a particular party more than the other. "Judicial partiality may be exhibited when an imbalance occurs with respect to either the frequency of the intervention or the manner of the conduct." *Id*. at 177. Determining whether judicial intervention was directed more toward a particular party is important because it helps "distinguish excessive but ultimately neutral questioning from biased judicial questioning." *Id*. at 188 (emphasis omitted). In this case, there was no imbalance of judicial intervention. While the trial judge's inquiries of Balash were extensive, the judge asked numerous witnesses various questions. In other words, the trial judge was an equal-opportunity questioner.

## E. ABSENCE OF CURATIVE INSTRUCTIONS

Finally, a reviewing court is to consider the presence or absence of curative instructions. In this instance, the trial court repeatedly reminded the jury that its questions were not meant to reflect any personal opinion and that it was for the jury to decide the facts. The judge further stated that if the jury for some reason thought that he had an opinion on the case, the jury was to ignore it and make its factual determinations on its own. Moreover, the trial court provided a curative instruction after it denied defendant's motion for a new trial. In that instruction, the court acknowledged that it asks lots of questions of witnesses and apologized for any delay its questions may have caused. The court also reiterated that the jury was the sole judge of the facts in this case and that if the jury thought the judge had an opinion about any fact in the case, that opinion was likely wrong and that in any event, the jury is to "totally disregard whatever you think I might be thinking because my thoughts on any issue, any witness, any fact, are totally irrelevant." The

---

[11] Indeed, defense counsel in arguing against an AWIM conviction with respect to Nordlund focused on how the evidence did not show that defendant had an intent to kill Nordlund.

-15-

judge also cautioned that the fact that he may have asked a lot of questions of various witnesses should not be interpreted as favoring or disfavoring any part of a witness's testimony. "Jurors are presumed to follow their instructions, and it is presumed that instructions cure most errors." *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). This fact weighs in favor of the conclusion that the trial judge's conduct did not pierce the veil of impartiality.

## F. CONCLUSION

In considering the totality of the circumstances, it is evident that the trial court asked numerous questions throughout the proceedings. Although the trial court's questioning of Balash appears to have been wholly unnecessary, the questioning did not show a bias against Balash or defendant. Instead, the questioning at most indicated that the trial judge for some reason thought the presence or absence of a metal jacket was significant, when all the evidence indicated that it was not. We cannot see how such questioning would have put Balash or defendant in a bad light. Moreover, in addition to the court providing general cautionary instructions related to how the jury is not to read anything into the court's questions, the court specifically instructed the jurors the day after Balash concluded his testimony that, while it asked a lot of questions, the jury must disregard whatever it believed the court may have thought related to any fact or witness. The court reiterated that the jury is the ultimate judge of the facts in the case.

With all of the above in mind, we conclude that the court's line of questions regarding the metal jackets did not pierce the veil of judicial impartiality, and therefore, the trial court did not abuse its discretion when it denied defendant's motion for a mistrial.

Affirmed.


/s/ Karen M. Fort Hood
/s/ Mark J. Cavanagh